## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ZEFERINO MARTINEZ, M.D.,

        Plaintiff,

    v.

UPMC SUSQUEHANNA,

        Defendant.

No. 4:19-CV-00327

(Chief Judge Brann)

## MEMORANDUM OPINION

### NOVEMBER 22, 2022

Plaintiff Zeferino Martinez, M.D., an orthopedic surgeon, sues his former employer, Defendant UPMC Susquehanna, for discriminating against him on the basis of his age. He alleges that UPMC discriminated against him when it terminated him, failed to rehire him, and replaced him with a younger surgeon when he was sixty-nine years old. UPMC had concerns about Martinez's performance when it acquired his previous employer, but it could not substantiate those concerns on the records available at the time. However, after hiring Martinez, UPMC learned that he failed to properly replace a patient's hip, requiring one of UPMC's other surgeons to perform a corrective procedure. Due to the failed operation, UPMC terminated Martinez pursuant to a mutual no-cause termination provision in his contract. UPMC now moves for summary judgment in its favor on Martinez's discrimination claims. For the following reasons, its motion will be granted.

## I.    BACKGROUND

### A.    UPMC's Acquisition of Lock Haven Hospital

In October 2016, Martinez began his employment with the Lock Haven Hospital as an orthopedic surgeon.[1] He was sixty-eight years old at the time.[2] In September 2017, Susquehanna Health acquired the Hospital, and then was immediately itself acquired by UPMC.[3] Matthew McLaughlin was UPMC's Executive Director of Musculoskeletal Services and accordingly served as the non-physician administrator of UPMC's orthopedic practice.[4] After the acquisition, he was Martinez's indirect supervisor.[5] He indirectly reported to Mellissa Davis, the Chief Operating Officer at Susquehanna Health.[6] Following UPMC's acquisition, McLaughlin was responsible for evaluating the performance of Martinez's orthopedic surgical practice.[7] His partner, an orthopedic surgeon named Ron Disimone, M.D., was responsible for evaluating Martinez's work as a surgeon.[8]

Prior to UPMC's acquisition, McLaughlin recalls learning of "several patients in [UPMC's offices]" who previously underwent "procedures [Martinez] performed that were not up to [UPMC's] accepted quality standards."[9] Other members of

---

[1]    Martinez Physician Employment Agreement, Doc. 36-3 at 1.
[2]    *See* Dep. of Zeferino Martinez, M.D., Doc. 35-5 at 5:18-24.
[3]    Dep. of Matthew McLaughlin, Doc. 35-1 at 17:6-21.
[4]    *Id.* at 11:14-25.
[5]    *Id.* at 13:16-18.
[6]    *Id.* at 14:3-14.
[7]    *Id.* at 19:20-25.
[8]    *Id.* at 20:1-3, 28:6-9.
[9]    *Id.* at 23:6-11.

UPMC's orthopedic team, such as physicians Jack Bailey, M.D., and Mark Rakish, M.D., "voiced concern about [Martinez] prior to the acquisition."[10] They "saw some of his patients for follow-ups following unsuccessful surgeries prior to [his] employment."[11]

Bailey was concerned that "the quality of [Martinez's] work was not up to [UPMC's] standards" and "had seen several patients that he thought had poor surgical outcomes."[12] He shared these concerns with McLaughlin, although McLaughlin cannot recall how often Bailey did so or any other specifics regarding Martinez's past operations.[13] Rakish shared similar concerns.[14] Rakish, Bailey, and Disimone continually expressed their concerns to McLaughlin, starting when UPMC announced its acquisition, and continuing through the deal's closing.[15] But McLaughlin never shared the physicians' concerns with Martinez.[16]

Instead, McLaughlin asked Daniel Glunk, UPMC's Chief Quality Officer, "to look at the Lock Haven Hospital records [and] the peer review, to find if there were any issues outstanding" with Martinez's work.[17] Glunk did not find any.[18] McLaughlin made several efforts to substantiate the physicians' concerns beyond

---

[10]   *Id.* at 24:11-17.
[11]   *Id.* at 24:17-20.
[12]   *Id.* at 25:21-25:1.
[13]   *Id.* at 25:3-14
[14]   *Id.* at 26:9-18.
[15]   *Id.* at 26:19-273.
[16]   *Id.* at 27:4-7.
[17]   *Id.* at 27:10-17.
[18]   *Id.* at 27:17-23; Martinez Consent to Assignment of Physician Employment Agreement, Doc. 36-8 at 1.

3

reaching out to Glunk.[19] He spoke to Becky Levi, Martinez's practice manager.[20] Levi was responsible for the administrative aspects of Martinez's practice, such as scheduling and billing, both before and after UPMC's acquisition.[21] Levi expressed her concern to McLaughlin that Martinez's patients developed infections or had to have surgeries redone following operations with Martinez.[22] She vaguely recalls raising these concerns to McLaughlin following UPMC's acquisition.[23]

Subsequently, McLaughlin wrote an email in October 2017 to his superior, Jan Fisher, referencing Levi's concerns "about compliance issues in the clinic as well as quality issues with [patient] outcomes."[24] McLaughlin also learned from Levi that Martinez generally did not order laboratory testing for his patients after operations even though it was "standard practice" to do so.[25] The absence of postoperative testing made it difficult to determine whether patients were developing infections at higher rates under Martinez's care.[26]

Following the October 2017 email, McLaughlin met with Davis and Dave Lopatofsky, M.D., the Chief Medical Officer at Susquehanna Medical Group, to discuss buying out Martinez's contract.[27] At that meeting, McLaughlin recalls

---

[19]   *See* McLaughlin Dep., Doc. 35-1 at 35:1-36:21, 47:6-18.
[20]   *Id.* at 48:7-48:4.
[21]   Dep. of Becky Levi, Doc. 35-4 at 13:16-14:1.
[22]   *Id.* at 25:14-26:7.
[23]   *Id.* at 26:8-20, 28:5-14, 37:19-38:20.
[24]   Email Exchange between McLaughlin and Jan Fisher, Doc. 36-20 at 2; McLaughlin Dep., Doc. 35-1 at 51:6-12.
[25]   McLaughlin Dep., Doc. 35-1 at 52:5-24.
[26]   *See id.*
[27]   *Id.* at 56:24-57:6.

"expressing grave concerns to both of them" over Martinez's performance.[28] But the trio agreed to proceed with taking over Martinez's contract because they could not substantiate their concerns.[29]

## B.    The Allegedly Failed Hip Operation

However, after the acquisition, Disimone, the UPMC physician charged with reviewing Martinez's surgical competence, brought to McLaughlin's attention "specific concerns [he] had over the quality of Martinez's work."[30] Disimone saw, "first hand, the results of a failed surgery performed by Martinez."[31] Specifically, a patient came to him with a "failed total left hip replacement as a result of a recent surgery performed by Martinez."[32] Disimone performed a corrective procedure.[33] He then "discussed with McLaughlin that the quality of Martinez's work was not up to [UPMC's] standard of practice, including specifics about the failed total left hip replacement."[34]

McLaughlin recalls Disimone contacting him regarding Martinez's failed operation and Disimone's subsequent corrective surgery in the fall of 2017, shortly after Martinez began his employment with UPMC.[35] Disimone "believed that

---

[28]   *Id.* at 57:7-11.
[29]   *Id.* at 57:12-15.
[30]   Decl. of Ron Disimone, M.D., Doc. 35-2 ¶ 5.
[31]   *Id.* ¶ 6.
[32]   *Id.*
[33]   *Id.* ¶ 7.
[34]   *Id.* ¶ 8.
[35]   *See* McLaughlin Dep., Doc. 35-1 at 23:12-20, 28:10-14.

[Martinez] was the surgeon of record [and] that the technique was grossly negligent."[36] McLaughlin recalls Disimone telling him that "Martinez reached out to Disimone to review the films and then to see the patient in the follow-up in [Disimone's] offices in Williamsport, which led to subsequent surgery and hospitalization."[37] Disimone believed that the issue "was improper installation of the [hip] prosthesis" and "performed both the outpatient assessment as well as the surgical intervention and the subsequent hospital management" of the patient himself.[38] Martinez does not recall reaching out to Disimone and generally denies ever speaking to him.[39]

Based on his discussions with Disimone, McLaughlin had "never [seen] a case . . . where a surgical technique was so far from the standard of care."[40] He believed that Martinez posed an "unreasonable risk of harm" to patients.[41] At some point between September and November 2017, McLaughlin informed Davis of the allegedly failed procedure and suggested that UPMC terminate Martinez.[42]

---

[36]   *Id.* at 23:21-22; Disimone Decl., Doc. 35-2 ¶ 4-5. In the cited paragraph, Disimone explains that he reviewed "McLaughlin's deposition testimony where he explained that [McLaughlin] and [he] discussed quality concerns over Martinez's work, during the fall of 2017" and found McLaughlin's recollection to be "consistent with [his] own recollection." *Id.* He also "could and would testify, if called to trial, to the facts set forth in [his] declaration based on [his] personal knowledge." *Id.* ¶ 9. The Court will continue to cite to McLaughlin's testimony with the understanding that Disimone has affirmed any statements or beliefs attributed to him in McLaughlin's deposition testimony and would be willing to testify to the same.

[37]   *Id.* at 28:15-22.

[38]   *Id.* at 28:23-29:12.

[39]   Martinez Dep., Doc. 35-5 at 61:11-23.

[40]   McLaughlin Dep., Doc. 35-1 at 31:25-32:12.

[41]   *Id.* at 32:13-18.

[42]   *Id.* at 37:9-38:4.

McLaughlin explains that Martinez's operation may have been escalated to the peer review committee, a committee of physicians that meet to assess "more serious" concerns with a "physician's competency."[43] However, Davis did not know whether Martinez's allegedly failed operation was escalated to a formal peer review or a less formal "desktop, topical review," in which the "the chief quality officer does a review and speaks with service line leaders and medical directors . . . to determine if further steps needed to be taken related to the quality of concern."[44] Davis stated that typically, such a review would generate a report, but she was unaware of whether one was created with respect to Martinez's failed hip operation.[45]

Martinez does not recall the allegedly failed procedure or Disimone reaching out to him about it, but he agrees that he generally performed hip replacements of that nature.[46] Had he failed in replacing a patient's hip, he believes that someone at UPMC or Lock Haven Hospital would have raised the issue with him and that it would have been "brought to the surgical committee" for review "before a formal concern [was] exposed."[47] He also suggested that an outside physician would have been brought in to offer an independent opinion on his performance in the procedure.[48] Martinez also denies that any of his other patients required corrective

---

43  *Id.* at 31:2-19.
44  Dep. of Melissa Davis, Doc. 35-3 at 40:12-41.
45  *Id.* at 41:15-42:1.
46  Martinez Dep., Doc. 33-5 at 60:21-8.
47  *Id.* at 57:3-19.
48  *Id.* at 57:20-58:1.

procedures, largely for the same reasons.[49] He believes that McLaughlin had an "obligation" to bring the failed hip procedure to his attention because that was consistent with the "regular business of orthopedics."[50] It is Martinez's position that UPMC should not have invoked the no-cause termination provision if it had concerns over his performance.[51]

The individuals responsible for ultimately deciding to terminate Martinez were Davis, Disimone, McLaughlin, Lopatofsky, Bailey, Glunk, and Fisher.[52] Davis explains that Martinez was terminated due to "quality concerns" and "patient safety."[53] She did not personally review the evidence related to those concerns but received information from McLaughlin and Disimone.[54] Based on that information, Davis agreed with her colleagues that Martinez's continued employment "pose[d] an unreasonable risk of harm to patients."[55] In the discussions involving Davis, the only incident raised was the failed hip replacement.[56] Davis and her colleagues decided to invoke the no-cause provision to immediately stop Martinez from seeing patients.[57] Davis acknowledges that Martinez's contract had a for-cause termination

---

[49]  *Id.* at 59:17-60:4.
[50]  *Id.* at 60:7-19.
[51]  *Id.* at 62:4-12.
[52]  Def.'s Resp. to Plf.'s Interrogatories, Doc. 36-10, at 4; Davis Dep., Doc. 35-3 at 13:2-9.
[53]  Davis Dep., Doc. 35-3 at 31:16-20.
[54]  *Id.* at 36:11-37:8.
[55]  *Id.*
[56]  *Id.* at 52:14-53:14.
[57]  *Id.* at 31:21-32:6; McLaughlin Dep., Doc. 35-1 at 78:15-23.

provision but explains that that provision would apply to situation such as a physician illegally prescribing or not following protocol.[58]

### C.   Martinez's Termination

McLaughlin and Davis together presented Martinez with his termination letter in November 2017 in Martinez's office.[59] Martinez was terminated pursuant to a mutual no-cause termination provision in his contract.[60] Davis explains that the termination letter was the "routine letter" UPMC used when invoking the mutual no-cause termination provision.[61] UPMC continued to pay Martinez for ninety days following his receipt of the termination letter.[62] Davis explained to Martinez that he would continue to receive compensation for ninety days and that any patients on his schedule would be assisted by other physicians.[63] She does not recall mentioning Martinez's failed hip operation or otherwise speaking about his performance as a surgeon.[64] At his deposition, McLaughlin also confirmed that Martinez was not terminated "due to a layoff or reduction in force or a lack of work."[65]

Martinez recalls Davis telling him "the hospital was looking in a different direction and they were going to change what they were going to do with the

---

[58]   Davis Dep., Doc. 35-3 at 35:6-9.
[59]   McLaughlin Dep., Doc. 35-1 at 20:13-22:5.
[60]   Martinez Physician Employment Agreement, Doc. 36-3 at 5; Def.'s Resp. to Plf.'s Interrogatories, Doc. 36-10 at 4.
[61]   Davis Dep., Doc. 35-3 at 32:7-13.
[62]   Termination Letter from Lopatofsky to Martinez, Doc. 33-5 at 38; Martinez Dep., Doc. 35-5 at 22:5-23:7.
[63]   Davis Dep., Doc. 35-3 at 33:24-34:8.
[64]   Id. at 34:16-19.
[65]   McLaughlin Dep., Doc. 35-1 at 69:24-70:3.

orthopedic department, and they didn't need [his] services anymore and they were going to let [him] go."[66] He also recalls a discussion of his continued compensation and benefits.[67] But he claims that someone at the meeting explicitly told him that his termination was not due to performance-related issues.[68] He suggested that the person could be McLaughlin but could not tell for sure.[69] He maintains that there was an additional, fourth person present at the meeting between him, McLaughlin, and Davis.[70] Davis does not recall McLaughlin saying anything at the meeting.[71]

### D.    Post-Termination Events

Following his termination, Martinez never complained to any authority at UPMC that he believed that UPMC discriminated against him on the basis of his age.[72] He was aware that Lock Haven Hospital had an antidiscrimination policy but did not know whether UPMC also had one.[73] UPMC closed down Martinez's practice and reallocated his patients to other physicians.[74] McLaughlin recalls Martinez only having four appointments to reallocate but is unaware of how he obtained that information.[75]

---

[66]   Martinez Dep., Doc. 35-5 at 28:15-19.
[67]   *Id.* at 28:20-29:1.
[68]   *Id.* at 70:15-71:4.
[69]   *Id.*
[70]   *Id.* at 71:5-73:3.
[71]   Davis Dep., Doc. 35-3 at 34:13-15.
[72]   Martinez Dep., Doc. 35-5 at 30:19-31:4., 31:13-18.
[73]   *Id.* at 30:24-31:9.
[74]   McLaughlin Dep., Doc. 35-1 at 68:9-14; Davis Dep., Doc. 35-3 at 65:2-12.
[75]   McLaughlin Dep., Doc. 35-1 at 72:10-21.

Shortly after Martinez's termination, UPMC began to look for other orthopedic surgeons to service Clinton County, Pennsylvania.[76] Martinez applied for an orthopedic position at UPMC's location in Sunbury, Pennsylvania.[77] He was eligible for rehire because he was terminated without cause, but neither McLaughlin nor Davis considered him for rehire due to concerns over the quality of his work.[78] Martinez also sought unemployment compensation. Both he and UPMC listed the reason for separation as "Laid Off/Lack of Work."[79]

UPMC hired two physicians relevant to this matter. In July 2017, before Martinez's termination, UPMC hired John Hunter, D.P.M., a forty-one-year-old podiatrist, to provide podiatry services, or medical treatment of the foot and ankle, in the Clinton County area.[80] Martinez explained that his wife learned through a nurse still working at UPMC that Hunter took over a few of his operations following his termination.[81] He also acknowledged that Hunter had a limited medical license and accordingly could only treat foot and ankle issues unlike Martinez's own unrestricted medical license.[82] As such, Hunter was only qualified to perform three of the thirty-three operations that Martinez performed in the five weeks before he

---

[76]   *Id.* at 68:14-17, 69:20-24, 76:12-23.
[77]   *Id.* at 77:22-78:4.
[78]   *Id.* at 78:9-13, 79:18-21; Davis Dep., Doc. 35-3 at 72:12-21.
[79]   *See* Doc. 36-16.
[80]   McLaughlin Dep., Doc. 35-1 at 74:24-76:3; Hunter Physician Employment Agreement, Doc. 36-22 at 13; Def.'s Resp. to Plf.'s Interrogatories, Doc. 36-10 at 9.
[81]   Martinez Dep., Doc. 35-5 at 42:3-44:8.
[82]   *Id.* at 45:13-47:4.

was terminated, which Martinez agreed was not a "significant" part of his practice.[83] In February 2018, UPMC also hired Wingrove Jarvis, M.D., a fifty-five-year-old orthopedist, to provide orthopedic services at UPMC Lock Haven, the former Lock Haven Hospital.[84]

### E.     Procedural History

Several months after his termination, Martinez filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), alleging that UPMC discriminated against him on the basis of age.[85] As required, UPMC filed a responsive Position Statement, in which it explained that "it made the business decision to enact the termination for 'no cause' language in Martinez's contract by providing him with 90 days of such notice."[86] It denied that age was a factor in Martinez's termination, explaining that it "was in a period of assessment and simply opted to execute its contractual right to terminate Martinez's employment."[87] The EEOC eventually closed Martinez's case and authorized him to bring this action.[88] The EEOC investigator explained that "[t]he evidence shows that [UPMC] recently hired a physician over the age of [seventy] and that the majority

---

[83]   *See id.* at 47:11-49:16; Martinez Operating Journal, Doc. 36-17.
[84]   McLaughlin Dep., Doc. 35-1 at 79:23-80:4; Davis Dep., Doc. 35-3 at 73:12-18; Jarvis Physician Employment Agreement, Doc. 36-21 at 13; Def.'s Resp. to Plf.'s Interrogatories, Doc. 36-10 at 10.
[85]   *See* Martinez EEOC Charge of Discrimination, Doc. 36-13 at 3.
[86]   UPMC EEOC Position Statement, Doc. 36-15 at 4.
[87]   *Id.*
[88]   *See* EEOC Dismissal and Notice of Rights, Doc. 35-5 at 152.

of [UPMC's] physicians are in the protected age group with several as old or older than [Martinez]."[89]

Following the resolution of the EEOC proceedings, Martinez sued UPMC in this Court. Citing the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 *et seq.*, Martinez alleges that UPMC discriminated against him on the basis of age when it terminated him and when it failed to rehire him, violating both the ADEA (Count I) and the PHRA (Count II).[90] He seeks compensatory and/or liquidated damages.[91]

UPMC previously moved to dismiss Martinez's Amended Complaint, which the Court granted.[92] The United States Court of Appeals for the Third Circuit reversed this Court, finding the allegations in the Amended Complaint sufficient to withstand UPMC's Motion to Dismiss.[93] The parties then engaged in discovery, and now, UPMC moves for summary judgment.[94] That motion has been fully briefed and is ripe for disposition.

---

[89] *See* Email from Damon Johnson, EEOC Investigator, to Sidney Gold, Counsel for Martinez, Doc. 35-5 at 153.
[90] *See* Amend. Compl., Doc. 11 at 6-7.
[91] *Id.* at 7-8.
[92] *Martinez v. UPMC Susquehanna*, 2019 WL 3776587 (M.D. Pa. Aug 12, 2019).
[93] *Martinez v. UPMC Susquehanna*, 986 F.3d 261 (3d Cir. 2021).
[94] Def.'s Mot. for Summary Judgment, Doc. 32.

## II.   LAW

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[95] Material facts are those "that could alter the outcome" of the litigation, "and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[96] A defendant "meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[97] Conversely, to survive summary judgment, a plaintiff must "point to admissible evidence that would be sufficient to show all elements of a *prima facie* case under applicable substantive law."[98]

The party requesting summary judgment bears the initial burden of supporting its motion with evidence from the record.[99] When the movant properly supports its motion, the nonmoving party must then show the need for a trial by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[100] The Third Circuit explains that the nonmoving party will not withstand summary judgment if all it has

---

[95]   Fed. R. Civ. P. 56(a).
[96]   *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010) (quoting *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993)).
[97]   *Clark*, 9 F.3d at 326.
[98]   *Id*.
[99]   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
[100]   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

are "assertions, conclusory allegations, or mere suspicions."[101] Instead, it must "identify those facts of record which would contradict the facts identified by the movant."[102]

In assessing "whether there is evidence upon which a jury can properly proceed to find a verdict for the [nonmoving] party,"[103] the Court "must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party."[104] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the Court may "consider the fact undisputed for purposes of the motion."[105] Finally, although "the court need consider only the cited materials, . . . it may consider other materials in the record."[106]

## III.   ANALYSIS

Age discrimination claims under the ADEA and the PHRA are assessed in the same manner.[107] When plaintiffs rely on circumstantial evidence of discrimination—as Martinez does—Courts apply the burden-shifting framework established in

---

[101] *Betts v. New Castle Youth Development Center*, 621 F.3d 249, 252 (3d Cir. 2010).

[102] *Port Authority of N.Y. and N.J. v. Affiliated FM Insurance Co.*, 311 F.3d 226, 233 (3d Cir. 2002) (quoting *Childers v. Joseph*, 842 F.2d 689, 694-95 (3d Cir. 1988)).

[103] *Liberty Lobby*, 477 U.S. at 252 (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 448 (1871)).

[104] *Razak v. Uber Technologies, Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

[105] Fed. R. Civ. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613-14 (3d Cir. 2018).

[106] Fed. R. Civ. P. 56(c)(3).

[107] *Burton v. Teleflex, Inc.*, 707 F.3d 417, 432 (3d Cir. 2013).

*McDonnell Douglas Corp. v. Green*.[108] Under that framework, Martinez bears the ultimate burden of proof, and the initial burden of production to demonstrate a *prima facie* case of discrimination."[109] To do so, he must show "that (1) he is at least forty, (2) he is qualified for the job, (3) he suffered an adverse employment action, and (4) he was replaced by (or passed over in favor of) someone else 'who was sufficiently younger so as to support an inference of a discriminatory motive.'"[110]

If Martinez establishes those four elements, "the burden of production shifts to [UPMC] to identify a legitimate non-discriminatory reason for the adverse employment action."[111] Should UPMC advance such a reason, "the burden of production returns to [Martinez] to demonstrate that [UPMC's] proffered rationale was a pretext for age discrimination."[112] At all times, however, the burden of persuasion rests with Martinez.[113]

### A.    *Prima Facie* Case

UPMC disputes only the fourth element of the *prima facie* case, that Martinez was replaced by a sufficiently younger individual when UPMC hired Hunter and

---

[108] *Smith v. City of Allentown*, 589 F.3d 684, 689 (3d Cir. 2009) (citing 411 U.S. 792 (1973)).

[109] *Id.* (citing *Potence v. Hazleton Area Sch. Dist.*, 357 F.3d 366, 370 (3d Cir. 2004)).

[110] *Martinez*, 986 F.3d at 265 (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015)).

[111] *Smith*, 589 F.3d at 690 (citing *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc)).

[112] *Id.* (citing *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1095 n. 4 (3d Cir.1995)).

[113] *Id.* (citing *Starceski*, 54 F.3d at 1095 n.4).

Jarvis.[114] The Court disagrees and concludes that Martinez has met his initial burden of production.

UPMC argues that Hunter did not replace Martinez because unlike Martinez, Hunter was a podiatrist.[115] Martinez counters that Hunter took over "many of the cases previously assigned to [him]" and "could perform many of the same surgeries commonly performed by [Martinez]."[116]

To be replaced by a sufficiently younger professional in a manner that raises the inference of discrimination, the professional must be in a "similarly situated" role.[117] "While 'similarly situated' does not mean identically situated, the plaintiff must nevertheless be similar [to his replacement] in 'all relevant respects.'"[118] Germane to that consideration is a "showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."[119]

---

[114] Def.'s Br., Doc. 33 at 6.

[115] *Id.* at 9.

[116] Plf.'s Opp. Br., Doc. 36 at 14.

[117] *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 222 (3d Cir. 2009).

[118] *Id.* (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997) *abrogated by Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1218 (11th Cir. 2019)). In *Lewis*, the United States Court of Appeals for the Eleventh Circuit disclaimed the standard it previously applied in *Holifield*, instead requiring that a discrimination plaintiff's "proffered comparators were 'similarly situated in all material respects.'" 918 F.3d at 1218. As the Court concludes that Hunter and Martinez are not similarly situated under either standard, the precise standard employed is immaterial.

[119] *Opstanik*, 335 F. App'x at 223 (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000)).

17

As Martinez admitted in his deposition, a podiatrist operates under a more restrictive license than does an orthopedic surgeon, or any physician with an M.D. for that matter.[120] Hunter was also hired well before Martinez was terminated and before Martinez was even brought onto the UPMC medical team.[121] Accordingly, Hunter and Martinez are not similarly situated. The fact that Hunter can perform some of the procedures Martinez does not outweigh the fact that he is legally precluded from performing most of the procedures that Martinez can perform.[122]

By contrast, Jarvis was hired to perform the same role that Martinez was terminated from and hired after Martinez's termination. UPMC argues that hiring Jarvis does not raise the inference of discrimination because Jarvis, a fifty-five-year-old physician, was also in the class of individuals protected by the ADEA and accordingly not significantly younger than Martinez.[123] But "there is no 'particular age difference that must be shown'" to establish a *prima facie* case of age discrimination.[124] As the Third Circuit held sufficient a sixteen-year age difference

---

[120]  Martinez Dep., Doc. 35-5 at 45:13-47:4.

[121]  Hunter Podiatrist Employment Agreement, Doc. 36-22 at 13 (signed July 23, 2017).

[122]  *Compare* 63 P.S. § 42.2(a) (defining "podiatric medicine" as "diagnosis and treatment including mechanical and surgical treatment of ailments of the foot, and those anatomical structures of the leg governing the functions of the foot and the administration and prescription of drugs incidental thereto"), *with* 63 P.S. § 422.29 (allowing medical doctors to "to practice medicine and surgery without any restriction or limitation").

[123]  Def.'s Br., Doc. 33 at 11-12. UPMC points out minor differences between Jarvis and Martinez, such as the fact that Jarvis covers several hospitals and Martinez only worked out of Lock Haven. These differences are insufficient to overcome Martinez's argument that Jarvis replaced him.

[124]  *Showalter v. U. of Pittsburgh Med. Ctr.*, 190 F.3d 231, 236 (3d Cir. 1999); *see also Sempier v. Johnson & Higgins*, 45 F.3d 724, 730 (3d Cir. 1995) (accepting as sufficient a four- and ten-year age gap between a plaintiff and his replacements).

in *Showalter v. University of Pittsburgh Medical Center*,[125] the Court concludes that the fourteen-year gap between Jarvis and Martinez is sufficient. Therefore, Martinez has established a *prima facia* case of age discrimination.

### B.    Legitimate, Non-Discriminatory Reasons

As discussed, under the *McDonnell Douglass* framework, now that Martinez has established a *prima facie* case of sex discrimination, the burden shifts to UPMC to present evidence supporting a legitimate, non-discriminatory reason for his termination.[126] UPMC asserts that it fired Martinez for his poor performance—namely, the failed hip operation noticed and corrected by Disimone. The Court is satisfied that UPMC has met its burden of production to show a legitimate reason for Martinez's termination and now turns to Martinez's pretext arguments.

### C.    Pretext

As UPMC has met its burden, the burden shifts back to Martinez to show that UPMC's reason for terminating him—his poor performance—is pretextual based on a preponderance of the evidence.[127] To do so, Martinez generally must submit evidence that: (1) "casts sufficient doubt upon each of the legitimate reasons proffered by [UPMC] so that a factfinder could reasonably conclude that each reason was a fabrication"; or (2) "allows the factfinder to infer that discrimination was more

---

[125] *Showalter*, 19 F.3d at 236.
[126] *Smith*, 589 F.3d at 689 (citing *Keller*, 130 F.3d at 1108).
[127] *Id.* at 763.

likely than not a motivating or determinative cause of [his termination]."[128] Martinez does not appear to argue the second theory, that his evidence shows that age motivated UPMC to terminate him. Instead, he relies only on the first, that UPMC's reliance on the allegedly failed hip operation is incredible and a reasonable jury may infer UPMC's discriminatory intent as a result.

But Martinez "cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."[129] Instead, he "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [its asserted] non-discriminatory reasons.'"[130]

To that end, Martinez first argues that the allegedly failed hip replacement is a "total fabrication" given UPMC's failure to provide evidence of the procedure and the Court should accordingly discredit that reason.[131] However, "the issue is not the correctness or desirability of [the] reasons offered . . . [but] whether [UPMC]

---

[128] *Fuentes*, 32 F.3d at 761.
[129] *Id.* at 765.
[130] *Id.* (citation omitted).
[131] Plf.'s Opp. Br. at 22.

honestly believes in the reasons it offers."[132] Therefore, Martinez cannot simply deny the operation ever occurred, he must show some evidence that UPMC did not believe it occurred. To do so, he points to the absence of the hip replacement in his operating journal.[133] Obviously, that five-page document is not a comprehensive record of every procedure Martinez completed, so the hip replacement's absence in the journal does not discredit UPMC's honest belief that it occurred.[134]

Second, Martinez submits that UPMC was inconsistent in its reasons for terminating him. At the November 2017 meeting during which Martinez was terminated, Davis told him UPMC was terminating him without a reason and that his performance was unrelated to his termination. Then, in response to Martinez's application for unemployment benefits, UPMC claimed to have laid Martinez off for lack of work.[135] In its Position Statement before the EEOC, UPMC explained that it "endeavored to comprehensively assess its clinical needs in the market" and "[i]n doing so, it made the business decision to enact the termination for 'no cause' language in Martinez's contract."[136] And now UPMC claims to have terminated

---

[132] *Fischbach v. D.C. Dep't. of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (alterations in original) (quoting *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 373 (7th Cir. 1992)); *accord Keller*, 130 F.3d at 1110 (stating that "the relevant question is not whether [the employee] could have done better; instead, the relevant question is whether the evidence shows that it was so clear that [the employee] could not have done better that [the employer] could not have believed otherwise").

[133] *See* Operating Journal, Doc. 36-17.

[134] *See Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005) (explaining that discrimination plaintiffs must "present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision.").

[135] *See* Doc. 36-16.

[136] UPMC EEOC Position Statement, Doc. 36-15 at 4.

Martinez for poor performance, the position it has maintained throughout this litigation.

"It is true that in extreme enough cases, an employer's inconsistencies in its proffered reasons for discharge can constitute evidence of pretext."[137] For instance, an employer cannot "exchange one set of reasons for a wholly unrelated set" later on.[138] Likewise, contradictory reasons or the retraction of a previously asserted reason are likely to indicate discrimination.[139] But offering an additional, related reason is less likely to indicate discrimination, even if the employer did not previously disclose it.[140]

But generally, "a finding of pretext is appropriate 'only where the other evidence of discrimination is sufficiently strong to ensure that the employer is held

---

[137] *Hoechstetter v. City of Pittsburgh*, 79 F. App'x 537, 539 (3d Cir. 2003) (citing *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 284 (3rd Cir. 2001); *Smith v. Borough of Wilkinsburg*, 147 F.3d 272, 281 (3rd Cir. 1998)).

[138] *Id.*; *see also Starks v. George Ct. Co., Inc.*, 937 F.2d 311, 314 (7th Cir. 1991) (finding an inconsistency where employer changed the reason for terminating an employee three times and none of the reasons were related to each other); *Patsakis v. Greek Orthodox Archdiocese of Am.*, 428 F. Supp. 2d 378, 383 (W.D. Pa. 2006) (Hardiman, J.) (finding an inconsistency where the employer first alleged one reason only to assert a new reason as its "sole motivation" months later).

[139] *See Fuentes*, 32 F.3d at 765; *Mascioli v. Arby's Rest. Group, Inc.*, 610 F. Supp. 2d 419, 439 (W.D. Pa. 2009) (finding an inconsistency where employer relied on other employees' complaints in firing the plaintiff and the employer was aware that the complainants later denied their allegations).

[140] *See Tidwell v. Carter Prods.*, 135 F.3d 1422, 1428 (11th Cir. 1998) (holding that at most, "the jury could find that performance was an additional, but undisclosed, reason for the decision; the existence of a possible additional non-discriminatory basis for [the plaintiff's] termination does not, however, prove pretext."); *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 733-34 (7th Cir. 2001) (finding no pretext where "there has been no retraction of any of its reasons nor are any of its reasons inconsistent or conflicting").

liable for unlawful discrimination and not merely for inconsistent statements.'"[141] This is especially the case when a plaintiff relies only on an inconsistency with no evidence otherwise indicating discriminatory animus.[142] Indeed, the "difficult burden" discrimination plaintiffs face to show pretext "arises from an inherent tension between the goal of all discrimination law and our society's commitment to free decisionmaking by the private sector in economic affairs."[143]

Perhaps the starkest alleged inconsistency is UPMC's shift from the business-needs justification it cited to Martinez and the EEOC[144] to the performance-based justification it now relies upon. In *Smith v. Borough of Wilkinsburg*, the Third Circuit confronted a similar inconsistency and held that a district court erred in failing to instruct the jury that it could, but need not, infer intentional discrimination where an employer "had advised the EEOC and the Pennsylvania Commission on Human Relations that it didn't renew [the plaintiff's] employment contract because he failed to file a formal application, in contrast to its explanation at trial which emphasized [his] poor job performance."[145]

---

[141] *Lyons v. City of Alexandria*, 35 F.4th 285, 292 (4th Cir. 2022) (quoting *Price v. Thompson*, 380 F.3d 209, 217 n.5 (4th Cir. 2004) *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).

[142] *See Hoechstetter*, 79 F. App'x at 539; *Hicks*, 509 U.S. at 519 ("It is not enough . . . to *dis*believe the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." (emphasis in original)).

[143] *Fuentes*, 32 F.3d at 765 (internal quotation marks omitted).

[144] The parties dispute whether Davis (or someone else present) told Martinez at the November 2017 meeting that his termination had anything to do with his performance. But at this stage, the Court must take all reasonable inferences in favor of Martinez, and it will therefore assume that someone said to Martinez that his termination was not related to his performance.

[145] 147 F.3d 272, 281 (3d Cir. 1998).

Here, it is true that UPMC made no mention of the hip procedure in its Position Statement during the EEOC proceedings or to Martinez when it terminated him. But that omission is a far cry from the two completely unrelated reasons the employer in *Smith* advanced. In context, UPMC's two justifications are related rather than inconsistent. It chose to invoke the no-cause provision in Martinez's employment agreement rather than firing him for cause to immediately stop Martinez from seeing patients *because* he presented an unreasonable risk of harm.[146] Therefore, "[a]t most, the jury could find that performance was an additional, but undisclosed, reason for the decision; the existence of a possible additional non-discriminatory basis for [Martinez's] termination does not, however, prove pretext."[147]

Third, Martinez suggests that UPMC's use of the no-cause termination provision is inconsistent with its concerns over his performance. He first argues that UPMC could have invoked the for-cause termination provision. But nothing in the record indicates that UPMC was required to invoke the for-cause provision. The choice between the two appears to be a business decision that the Court will not

---

[146] McLaughlin Dep., Doc. 35-1 at 78:15-23; Davis Dep., Doc. 35-3 at 31:21-32:6

[147] *Tidwell*, 135 F.3d at 1428; *accord Carlson v. Township of Lower Alloways Creek*, 452 F. App'x 95, 103 (3d Cir. 2011) (concluding that employer's reliance on employee's poor performance in addition to the fact that the employer believed it did not need cause per its contract with the employee was not an inconsistency but instead "present[ed] additional reasons for the decision" (citing *Smith*, 147 F.3d at 281)).

second-guess.[148] Indeed, the general language that UPMC used in its Position Statement—that it made a "business decision" to terminate Martinez via the no-cause provision—could be consistent with many nondiscriminatory justifications, including his performance.[149] But that is what Martinez bargained for when he signed his employment agreement. Therefore, the fact that UPMC invoked that provision but relied on Martinez's performance is of no moment in the Court's pretext analysis because he cannot undermine or cast doubt on UPMC's honestly held concern that he failed to properly replace a patient's hip.

Fourth, Martinez argues that UPMC's concern over his competence is inconsistent with the fact that he was eligible for rehire. But McLaughlin and Davis both explained that even though he was eligible, they did not rehire him because they were concerned about his competence as a surgeon.[150] Martinez also argues that UPMC failed to observe formal procedures such as peer review and obtaining an independent physician's opinion. But he provides no evidence that any of his suggested procedures were required. He simply believes they were required because that was the "regular business in orthopedics."[151] And even if UPMC required and

---

[148] Apparently, counsel guided UPMC in choosing one provision over the other. *See* McLaughlin Dep., Doc. 35-1 at 67:8-68:8. These discussions are privileged, but Martinez offers no evidence to suggest that UPMC's decision contradicts its reliance on his failed hip operation.

[149] *See Ward v. City Lighting Products Co.*, 2021 WL 1720661, at *8 (W.D. Pa. Apr. 30, 2021) (finding no inconsistency where employer first relied on an employee's inability to work with others and later proffered as reason for termination a violent incident instigated by the employee because the former "encompassed" the latter).

[150] McLaughlin Dep., Doc. 35-1 at 78:5-79:1; Davis Dep., Doc. 35-3 at 72:12-21.

[151] Martinez Dep., Doc. 35-5 at 60:7-19.

did not follow certain procedures with respect to Martinez, he must show that UPMC did observe them with respect to substantially younger physicians.[152] The record contains no evidence of that sort.

Lastly, Martinez raises an alleged contradiction between UPMC's response to his application for unemployment, in which it asserted that he was laid off, and UPMC's consistent refrain that he was fired for the failed hip replacement. That too is unavailing. It is true that McLaughlin specifically denied that Martinez was laid off.[153] But boiled down, this is a dispute over nomenclature, not a contradiction. "The Court fails to see how UPMC's "supposed mendacity on this subject is anything more than a difference in semantics, particularly when [it] concedes that the 'lay off' was an adverse employment action."[154] Indeed, Martinez himself identified his termination as a lay off. The Court does not find this technical contradiction in one document devoid of context rises to the "extreme" level from which a reasonable jury could infer pretext.

As all of Martinez's claimed inconsistencies are unavailing, the Court concludes that he fails to establish a genuine issue of material fact that UPMC's reason for terminating him was pretextual.

---

[152] *See Maull v. Div. of State Police*, 39 F. App'x 769, 774 (3d Cir. 2002) (concluding that "simply pointing to violations is inadequate without evidence that [employees outside of the protected class] were treated differently by [the employer] with respect to these policies.") (internal quotation marks omitted) (citing *English v. Colorado Dep't of Corr.*, 248 F.3d 1002, 1009 (10th Cir. 2001)).

[153] McLaughlin Dep., Doc. 35-1 at 69:24-70:3.

[154] *E.E.O.C. v. C.G. Schmidt, Inc.*, 670 F. Supp. 2d 858, 868 (E.D. Wis. 2009).

## IV.   CONCLUSION

For the foregoing reasons, UPMC's Motion for Summary Judgment is granted. An appropriate Order follows.

BY THE COURT:

_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge